Nos. 13-2189, 13-3177

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

MARTIN ANAYA and DANTE REYES,

Defendants-Appellants.

On Appeal From The United States District Court
For The Northern District Of Indiana
Case No. 10 CR 109 (Hon. Rudy Lozano)

**BRIEF FOR THE UNITED STATES**

DAVID CAPP
  United States Attorney
  Northern District of Indiana

DAVID J. NOZICK
  Assistant U.S. Attorney
  Northern District of Indiana

JOSEPH A. COOLEY
  Trial Attorney
  Organized Crime & Gang Section
  Criminal Division

DAVID A. O'NEIL
  Acting Assistant Attorney General
  Criminal Division

DAVID M. BITKOWER
  Deputy Assistant Attorney General

KIRBY A. HELLER
  Attorney
  Appellate Section, Criminal Division
  U.S. Department of Justice
  950 Pennsylvania Ave., NW Room 1256
  Washington, DC 20530
  (202) 307-0085
  kirby.heller@usdoj.gov

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

STATEMENT OF THE ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

    1.    Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

    2.    Relevant Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

        A.    The Latin Kings. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

        B.    The Campos Murder. . . . . . . . . . . . . . . . . . . . . . . . .  5

    3.    Rulings Under Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

I.    The District Court Did Not Commit Reversible Error In
    Calculating Anaya's Advisory Guidelines Range And By Sentencing
    Him To 30 Years Of Imprisonment. . . . . . . . . . . . . . . . . . . . . . . 10

    A.    Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    B.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    C.    The District Court Did Not Clearly Err By Finding That
        Anaya Was Responsible For Campos's Murder And It Properly
        Considered The Murder In Calculating Anaya's Guidelines. . . . 13

D.  The District Court Did Not Err In Concluding By A Preponderance Of The Evidence That Anaya Was Responsible For More Than 150 Kilograms Of Cocaine.. . . . . . . . . . . . . . 18

E.  Anaya's Sentence Was Substantively Reasonable.. . . . . . . . . . 21

II.  Reyes's Appeal Should Be Dismissed Because He Knowingly And Voluntarily Pleaded Guilty And Waived His Right to Appeal.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

A.  Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

B.  Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

C.  The District Court Complied With Rule 11 Of The Federal Rules  Of Criminal Procedure And Did Not Err By Accepting Reyes's Guilty Plea.. . . . . . . . . . . . . . . . . . . . . . . . 27

D.  This Court Should Dismiss Reyes's Appeal Because He Voluntarily Waived His Right To Appeal... . . . . . . . . . . . . . . . 32

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . . . 36

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Barker v. United States*, 7 F.3d 629 (7th Cir. 1993). . . . . . . . . . . . . . . . . . . . . 32

*United States v. Adams,* --- F.3d ---, 2014 WL 718366
  (7th Cir. Feb. 28, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Alcala*, 678 F.3d 574 (7th Cir. 2012).. . . . . . . . . . . . . 18, 32, 33

*United States v. Alleyne*, 133 S. Ct. 2151 (2013). . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Annoreno*, 713 F.3d 352 (7th Cir.),
  *cert. denied*, 134 S. Ct. 335 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Barnes*, 83 F.3d 934 (7th Cir. 1996). . . . . . . . . . . . . . . . . . . 30

*United States v. Booker*, 543 U.S. 220 (2005). . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Brown*, 732 F.3d 781 (7th Cir. 2013). . . . . . . . . . . . . . . . . . . 23

*United States v. Claybrooks*, 729 F.3d 699 (7th Cir. 2013)     . . . . . . . . . . . 13

*United States v. Collins*, 604 F.3d 481 (7th Cir. 2010). . . . . . . . . . . . . . . . . . 15

*United States v. Dominguez Benitez*, 542 U.S. 74 (2004). . . . . . . . . . . . . . . . . 32

*United States v. Frye*, 738 F.2d 196 (7th Cir. 1984). . . . . . . . . . . . . . . . . . 29, 30

*United States v. Horne*, 474 F.3d 1004 (7th Cir. 2007). . . . . . . . . . . . . . . 14, 15

*United States v. Kilcrease*, 665 F.3d 924 (7th Cir. 2012). . . . . . . . . . . . . . 27, 32

*United States v. McCauley*, 659 F.3d 645 (7th Cir. 2011). . . . . . . . . . . . . . . . 17

*United States v. Medina*, 728 F.3d 701 (7th Cir. 2013).. . . . . . . . . . . . . . . . . 19

*United States v. Messino*, 55 F.3d 1241 (7th Cir. 1995). . . . . . . . . . . . . . . . . . 28

*United States v. Mitchell*, 635 F.3d 990 (7th Cir. 2011). . . . . . . . . . . . . . . . . 14

*United States v. Nania*, 724 F.3d 824 (7th Cir. 2013).. . . . . . . . . . . . . . . . . . 22

*United States v. Pape*, 601 F.3d 743 (7th Cir. 2010).. . . . . . . . . . . . . . . . . . . 22

*United States v. Patterson*, 576 F.3d 431 (7th Cir. 2009). . . . . . . . . . . . . . . . 27

*United States v. Reuter*, 463 F.3d 792 (7th Cir. 2006). . . . . . . . . . . . . . . . . . 14

*United States v. Schuster*, 706 F.3d 800 (7th Cir.),
    *cert. denied*, 133 S. Ct. 2813 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Seymour*, 519 F.3d 700 (7th Cir. 2008). . . . . . . . . . . . . . . . . 20

*United States v. Tapia*, 610 F.3d 505 (7th Cir. 2010).. . . . . . . . . . . . . . . . . . 15

*United States v. Turner*, 604 F.3d 381 (7th Cir. 2010). . . . . . . . . . . . . . . . . . 23

*United States v. Useni*, 516 F.3d 634 (7th Cir. 2008). . . . . . . . . . . . . . . . . . . 17

*United States v. Walker*, 721 F.3d 828 (7th Cir. 2013),
    *pet. for cert. filed*, No. 13-7557 (Nov. 21, 2013). . . . . . . . . . . . . . . . . . . . . 27

*United States v. Watts*, 519 U.S. 148 (1997). . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Westmoreland*, 240 F.3d 618 (7th Cir. 2001). . . . . . . . . . . . . 16

*United States v. Zitt*, 714 F.3d 511 (7th Cir. 2013). . . . . . . . . . . . . . . . . . . . . 33

## FEDERAL STATUTES, RULES, AND SENTENCING GUIDELINES

18 U.S.C. § 924(c).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 924(j). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 1959(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 1962(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3553(a)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

21 U.S.C. § 841(b)(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

21 U.S.C. § 846. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 2255. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

Fed. R. Crim. P. 11(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 28

U.S.S.G. § 2A1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

U.S.S.G. § 2D1.1(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

U.S.S.G. § 2D1.1(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

U.S.S.G. § 2E1.1(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

U.S.S.G. § 3D1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

U.S.S.G. § 3D1.4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

U.S.S.G. § 4B1.1(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## STATE CASES

*In re Dionte J.*, 993 N.E.2d 909 (Ill. App. Ct. 2013). . . . . . . . . . . . . . . . . . . . . 18

*People v. Banks*, 678 N.E.2d 348 (Ill. App. Ct. 1997). . . . . . . . . . . . . . . . . 17

## STATE STATUTES

720 Ill. Comp. Stat. 5/9-1(a)(3)(West 2002). . . . . . . . . . . . . . . . . . . . . . . . 17

720 Ill. Comp. Stat. 5/25-1(a)(1)(West 2008). . . . . . . . . . . . . . . . . . . . . . . .  17

## JURISDICTIONAL STATEMENT

The jurisdictional summaries in the briefs of defendants Martin Anaya and Dante Reyes are complete and correct.

## STATEMENT OF THE ISSUES

1. Whether the district court erred by considering Anaya's role in the murder of Christina Campos in calculating his advisory guidelines range.

2. Whether the district court erred by finding drug quantity based on a preponderance of the evidence for purposes of calculating Anaya's guidelines range.

3. Whether Anaya's below-guidelines sentence of 30 years of imprisonment was substantively unreasonable.

4. Whether Reyes knowingly and voluntarily waived his right to appeal.

## STATEMENT OF THE CASE

1.    Procedural History

On November 16, 2011, a federal grand jury in the Northern District of Indiana filed a superseding indictment charging Anaya, Reyes and 17 others with conspiracy to participate in racketeering activities (RICO conspiracy), in violation of 18 U.S.C. § 1962(d) (count one), and conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine and 1,000 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A) (count two). G.A.

1-29.[1] As relevant here, it further charged Anaya and two others with murdering Christina Campos in aid of racketeering, in violation of 18 U.S.C. §§ 1959(a)(1) and 2 (count ten), and causing the death of Campos through the use and discharge of weapons during and in relation to crimes of violence and drug trafficking, in violation of 18 U.S.C. §§ 924(c), 924(j), and 2 (count eleven). G.A. 38-39.

A jury convicted Anaya of counts one and two and acquitted him of counts ten and eleven. R. 582; Anaya App. 1. On a special verdict form pertaining to its guilty verdict on the RICO conspiracy count, the jury reported that (1) it did not find that Anaya murdered Campos pursuant to an understanding that he would receive something of value in return, and (2) it did not find that he conspired to distribute and possess with intent to distribute five kilograms or more of cocaine and 1,000 kilograms or more of marijuana. R. 582; Tr. 1176-77.

Pursuant to the terms of a plea agreement, Reyes pleaded guilty to RICO conspiracy and waived his right to appeal. R. 809, 810; G.A. 47-52.

---

[1] "G.A." refers to the government's supplemental appendix; "R." refers to items listed on the district court's docket; "Tr." refers to trial transcripts; "Plea Tr." refers to Reyes's change-of-plea hearing transcript; "Sent. Tr." refers to the sentencing transcripts; and "App." refers to defendants' short appendixes.

2

The district court sentenced Anaya to 30 years of imprisonment, to be followed by years of five supervised release. Anaya App. 2-3. It sentenced Reyes to 262 months of imprisonment, to be followed by three years of supervised release. Reyes App. 2-3.

These appeals followed.

2.     Relevant Facts.

Viewed in the light most favorable to the verdicts, the evidence established the following.

A.     The Latin Kings

Defendants were members of the Latin Kings, a violent street gang with chapters nationwide, including in Chicago (the "Motherland"), Indiana, and Texas. Tr. 34-35, 795-97; Plea Tr. 31. Gang members were required to follow a detailed set of laws, memorialized in a "Manifesto," and were subject to punishment if they violated the code. *E.g.*, Tr. 39-48, 836, 841.

The Latin Kings engaged in various criminal activities related to the drug trade, ranging from the distribution of illegal drugs to the violence that accompanies drug dealing. To protect against encroachment by rival gangs, members were required to "hold[] down security," which involved "shoot[ing] at [rival gang members]" or "throw[ing] bricks, bottles, whatever" if the rivals

3

showed up in Latin King neighborhoods. Tr. 46; *see also* Tr. 46-47 (if rival gang drives through a Latin Kings neighborhood, regardless of whether the rivals open fire, "we're going to shoot at them because that's security purposes"), 136 (same); 269-270 (same; gang members without guns will throw bottles or bricks when they see rivals' vehicles crossing through their neighborhood); 313 (same); 450-51 (same). By the same token, Latin Kings were not permitted to ride through rivals' territory without protection, and those who violated the rule would get "whooped." Tr. 841; *see also ibid.* ("If [Latin Kings] were out in the neighborhood and they didn't have guns in their own neighborhood, they would get violated. So if they were going to rival gang neighborhoods and they didn't have no weapons, that's jeopardizing their lives. They're going to get dealt with real bad.").

Anaya belonged to the "Bush" chapter in the Southeast Chicago region. Tr. 69, 71-72, and he held various leadership positions, including that of "Enforcer" and chapter leader ("Inca"). Tr. 118, 840. It was "no secret" that his region distributed huge amounts of cocaine and marijuana. Tr. 251; *see also, e.g.*, Tr. 276-78, 451-53, 805, 808-09, 829. The gang members discussed their drug dealing at their meetings, Tr. 260, and their dues went towards the purchase of drugs, Tr. 262. Although he was not a "real big drug dealer," Anaya would sell drugs "if he could get his hands on it." Tr. 120.

4

Reyes was affiliated with the South Texas branch of the Latin Kings. Plea Tr. 34. He joined the gang when he was 18 and rose through the ranks to become the "South Texas Regional Inca." Plea Tr. 32, 34, 39; Reyes PSR ¶ 6. Reyes was also a drug dealer. He helped supply cocaine and marijuana to Latin King members in Texas and elsewhere; on occasion he transported the drugs himself. Plea Tr. 34-37, 39-40; PSR ¶¶ 8-14.

B.     The Campos Murder

In the early morning hours of April 22, 2009, Anaya and three other Latin King members (Jason Ortiz, Brandon Clay, and juvenile "DK") drove in Anaya's van into the territory of the Latin Counts, a rival street gang. Tr. 47, 131-33, 213, 396, 398. As three Latin Count members – Benjamin Daniels, Isaac Wilhelm, and Christina Campos – were walking to Wilhelm's car, the van drove the wrong direction on a one-way street and stopped alongside the Latin Counts group. Tr. 735-36, 878, 880. According to Wilhelm, the four men in the van said "What's up Count" and "Count killer," Tr. 880, the latter being an expression of disrespect to the Counts, Tr. 749. The Latin Kings jumped out of the van and started shooting and throwing bottles at the unarmed Counts. Tr. 738, 881. A neighbor (Mary Gonzalez) heard the commotion; after hearing the first round of shots, she went outside and saw a man, whom she later identified from a lineup as Anaya, walk

5

between two cars, lean over, and "start[] firing away" at the ground.[2] Tr. 633-35, 671-82, 692-94. The shooter then got back in the van, and it drove off. Tr. 683. Although Gonzalez could not see the shooter's target, Campos was lying at the precise spot that Gonzalez described. Tr. 469, 682, 684-85. As Gonzalez re-entered her house, she heard some talking and saw her neighbor, a known member of the Latin Counts, exit his residence with a gun in hand. Tr. 685-86. She then heard someone say "they shot him," followed by additional shooting from both sides of the street. Tr. 687-88.

Campos died shortly thereafter from a gunshot wound to her chest. Tr. 543, 997. The medical examiner explained that the bullet went downward "at a very sharp angle" through Campos's chest and out her lower back and that her wound was consistent with the shooter standing above a sitting or kneeling victim. Tr. 988-90.

The four Latin Kings had a different version of events. On the day after the murder, Ortiz told his Inca (Jose Zambrano) that he, Anaya, "Cheddar" (Brandon Clay) and "DK" were involved in a shooting the previous day and that the Counts

---

[2] Benjamin Daniels identified Anaya from a photospread as the front passenger in the van who said "What up Count." Tr. 722-23. Isaac Wilhelm identified Anaya from a lineup and in court as the passenger who came out of the van and said "Count killer." Tr. 870-73, 888, 892-93.

were trying to blame the Latin Kings for "some girl getting killed." Tr. 132-33. According to Ortiz, the four "rode up" to "two guys and a girl" and "threw open the van door, . . . jumped out and started throwing bottles at them." Tr. 214. Because Zambrano knew a lot of Counts, the four Latin Kings wanted Zambrano to "get ahold of the Counts and tell them that the Counts are the ones that accidentally shot the girl." Tr. 133. Ortiz also told Zambrano that the four Latin Kings were not armed, Tr. 133, but Zambrano did not believe him, Tr. 225. Similarly, Brandon Clay told another Latin King leader (Jermaine Ellis) that the four Latin Kings "hopped out" of their car and "were throwing bottles" and "[t]hen the Counts shot at them and then shot the car up and made a mistake and shot the girl in the back." Tr. 397. Clay told Ellis that they did not have any guns; like Zambrano, Ellis did not believe that Clay would have driven through Latin Counts territory unarmed. Tr. 398-99.

3.    Rulings Under Review

The rulings under review are the district court's finding by a preponderance of the evidence that Anaya was liable for the Campos murder (Sent. Tr. 42); the district court's calculation of drug quantity attributed to Anaya under a preponderance-of-the-evidence standard (Sent. Tr. 42, 44); the district court's imposition of a 30-year sentence on Anaya (Sent. Tr. 75); and the district court's

7

finding that Reyes's guilty plea was knowing and voluntary (Plea Tr. 41-42).

## SUMMARY OF ARGUMENT

1. The district court did not clearly err by finding Anaya responsible for Campos's murder, and it properly considered the murder in calculating the guidelines. A sentencing court need only find facts bearing on the application of the advisory sentencing guidelines by a preponderance of the evidence, and the district court found credible the testimony of three witnesses who identified Anaya as shooting at the three Latin Counts. In addition, even if Campos had been accidentally shot by a Latin Count, the district court did not err in holding Anaya responsible under a felony murder theory. By throwing bottles at the rival gang members, Anaya committed the Illinois state felony of mob action, and he could reasonably foresee that someone would get shot as a result.

2. The district court also correctly applied the preponderance-of-the-evidence standard in finding Anaya responsible for more than 150 kilograms of cocaine that were distributed by his fellow Latin Kings. The huge quantity of drugs distributed by Anaya's region was "no secret," Tr. 251, and the gang's drug trafficking activities were discussed at their mandatory meetings. As a result of his leadership positions in the gang and his relationship with one of the gang's top drug dealers, Anaya also would have been aware of the scope of the drug conspiracy. Moreover,

because his guidelines range would have been the same even if his co-conspirators' drug quantities had not been attributed to Anaya, any error was harmless.

3. Anaya's 30-year sentence was substantively reasonable. His advisory guidelines range was life, and the district court considered the Section 3553(a) sentencing factors in imposing a sentence below the guidelines. The district court did not need to further consider the need to avoid unwarranted sentencing disparities because his sentence was below the guidelines range and the sentences of his co-conspirators reflected differences in their circumstances.

4. This Court should dismiss Reyes's appeal. He entered into a plea agreement with the government that included an appeal waiver provision. At the change of plea hearing, the district court complied in full with Fed. R. Crim. P. 11(b), and it explained in detail the consequences of Reyes's waiving his right to appeal. The court did not err by concluding that Reyes knowingly and voluntarily pleaded guilty, and Reyes's challenges to the plea agreement and plea colloquy are precluded by his appeal waiver.

# ARGUMENT

I.   The District Court Did Not Commit Reversible Error In Calculating Anaya's Advisory Guidelines Range And By Sentencing Him To 30 Years Of Imprisonment.

Anaya contends that the district court erred procedurally in calculating his advisory guidelines range and substantively in sentencing him to 30 years of imprisonment. His claims lack merit.

A.    Background

The PSR calculated a base offense level of 43 for the RICO conspiracy conviction, using the offense level for the underlying racketeering activity – the first-degree murder of Campos. PSR ¶ 17; *see* U.S.S.G. §§ 2E1.1(a)(2), 2A1.1. In summarizing the evidence against Anaya, the PSR included Brandon Clay's and DK's statements to police about Anaya's  possession of a handgun during the confrontation and his role in the shooting. PSR ¶ 5. The PSR calculated a base offense level of 38 for the drug conspiracy, based on a drug equivalency of 31,000 kilograms of marijuana (150 kilograms of cocaine and 1,000 kilograms of marijuana), PSR ¶¶ 10-12, 23, and it added two levels for Anaya's possession of a gun, Revised PSR ¶ 24; *see* U.S.S.G. §§ 2D1.1(b)(1), (c)(1). After applying the multiple-count and career-offender guidelines, the PSR assigned Anaya a total offense level of 43 and a criminal history category of VI. PSR ¶¶ 29-33, 56, *see*

U.S.S.G. §§ 3D1.1, 4B1.1(b). Anaya's advisory guidelines range was therefore life. PSR ¶ 109. As relevant here, Anaya objected to the PSR's reliance on the Campos murder to calculate the RICO conspiracy base offense level and disputed the drug quantity determination. Addendum to the PSR.

Anaya renewed his objections at sentencing. Sent. Tr. 13-20, 24-27. As to the Campos murder, he argued that the witness identifications included in the PSR were unreliable and that the admissions of DK and Brandon Clay should not be credited because DK later recanted the incriminating statements and Clay was pressured by the police. Sent Tr. 15-18, 24. He also relied on the co-conspirators' own statements and information from a Latin Count to argue that the Latin Counts accidentally killed Campos. Sent. Tr. 16, 18-19.

The district court agreed that the credibility of DK and Clay was "questionable" and that there was "some evidence" that the Latin Kings did not shoot Campos. Sent. Tr. 40. Nonetheless, it noted that other witnesses had implicated Anaya in the shooting, and it specifically credited the testimony of Mary Gonzales, Benjamin Daniels, and Isaac Wilhelm in that regard. Sent. Tr. 40-41. The court rejected Anaya's argument that it should apply a "clear and convincing" standard of proof and found by a preponderance of the evidence that Anaya "was responsible" for the Campos murder. Sent. Tr. 42. In the alternative,

the court agreed with the government that Anaya was guilty under a felony murder theory. The court reasoned that, after Campos flashed a gang sign, the Latin Kings responded by committing the Illinois state offense of "mob action" (*i.e.*, throwing beer bottles and fighting) and that Campos's murder "was foreseeable the moment the Latin Kings turned their van around to confront the Latin Counts." Sent. Tr. 42-43.

The court also overruled Anaya's objection to the PSR's drug quantity finding. It relied on Anaya's 21-year membership in the Latin Kings and his leadership position to conclude that he "would have been aware of the large scale narcotics distribution ring that his fellow gang members participated in" and that he, along with all the other gang members, benefitted from the drug profits. Sent. Tr. 43-44.

The court sentenced Anaya to 30 years of imprisonment. Tr. 75. Although it considered the guidelines sentence of life to be "pretty accurate" and "pretty fair," Sent. Tr. 72, it took into account Anaya's age, his relationship with his family and children, and the sentences it imposed on Anaya's co-defendants in varying downward from the guidelines range. Tr. 73-75; *see also* Sent. Tr. 78-79 (listing the Section 3553(a) sentencing factors that the court considered in imposing a sentence that it considered fair).

B.    Standard Of Review

The Court reviews procedural sentencing claims de novo, including whether the district court correctly calculated the sentencing guidelines range. *United States v. Annoreno*, 713 F.3d 352, 356-57 (7th Cir.), *cert. denied*, 134 S. Ct. 335 (2013). It reviews the substantive reasonableness of a sentence for abuse of discretion. *Ibid.* The Court reviews findings of fact for clear error. *United States v. Claybrooks*, 729 F.3d 699, 706 (7th Cir. 2013). "A finding of fact is clearly erroneous only if, based upon the entire record, [the Court] [is] left with the definite and firm conviction that a mistake has been committed." *United States v. Schuster*, 706 F.3d 800, 804 (7th Cir.) (quotation marks and citations omitted), *cert. denied*, 133 S. Ct. 2813 (2013).

C.    The District Court Did Not Clearly Err By Finding That Anaya Was Responsible For Campos's Murder And It Properly Considered The Murder In Calculating Anaya's Guidelines.

Anaya contends (Anaya Br. 5) that the district court erred by "giv[ing] him an enhanced sentence" based on Campos's murder. Specifically, he claims that the district court should not have adopted a preponderance-of-the-evidence standard and that the evidence was insufficient even under that standard.

As an initial matter, it is well established that a district court can consider acquitted conduct at sentencing so long as the conduct is established by a

13

preponderance of the evidence. *United States v. Watts*, 519 U.S. 148 (1997) (per curiam); *see also United States v. Horne*, 474 F.3d 1004, 1006 (7th Cir. 2007) ("All an acquittal means is that the trier of fact, whether judge or jury, did not think the government had proved its case beyond a reasonable doubt. The facts that a sentencing judge finds in determining what sentence to impose . . . need be found only by a preponderance of the evidence, the normal civil standard."). This Court has also explained that the debate about whether proof by "clear and convincing" evidence is required when the findings substantially increase the sentence "has been rendered academic" by *United States v. Booker*, 543 U.S. 220 (2005). *United States v. Reuter*, 463 F.3d 792, 792-93 (7th Cir. 2006); *see also id.* at 793 ("With the guidelines no longer binding the sentencing judge, there is no need for courts of appeals to add epicycles to an already complex set of (merely) advisory guidelines by multiplying standards of proof."); *United States v. Mitchell*, 635 F.3d 990, 993 (7th Cir. 2011) (re-affirming *Reuter*). Although a district court may decide in a particular case that a sentence based almost entirely on evidence that meets the preponderance standard is inconsistent with a statutory sentencing factor (*e.g.*, "promot[ing] respect for the law"), *Reuter*, 463 F.3d at 793, the district court correctly concluded that "there is [nothing] so unusual about this case that deviating from the normal standard of proof is justified." Sent. Tr. 42. The

14

Campos murder did not disproportionately affect the calculation of Anaya's guidelines; the jury also convicted him of a serious drug offense that carried a maximum sentence of life imprisonment and an advisory guidelines range of 360 months to life. *See Horne*, 474 F.3d at 1007 (rejecting defendant's argument that sentence based on acquitted conduct was wrong and noting that "[t]his is not a case in which a jury convicts a defendant of one very minor crime and acquits him of the serious crimes with which he was charged, and the judge then bases the sentence almost entirely on those crimes").

The district court also did not clearly err in finding by a preponderance of the evidence that Anaya was responsible for Campos's murder. Eyewitness Mary Gonzalez identified Anaya as the shooter in a lineup that took place within weeks of the murder, Tr. 624, and the district court's credibility finding as to her account of the shooting is entitled to a "high level of deference." *United States v. Tapia*, 610 F.3d 505, 513 (7th Cir. 2010) (internal quotation marks and citation omitted); *see also United States v. Collins*, 604 F.3d 481, 486 (7th Cir. 2010) (in determining whether clear error has occurred, "[p]articular deference is given to credibility determinations, which will not be disturbed unless completely without foundation") (internal quotation marks omitted). Although Gonzalez could not see what Anaya was shooting at, it was uncontested that Campos was lying at the

exact location that Gonzalez described. Gonzalez's description was also consistent with the testimony of the medical examiner, who explained that an individual standing directly above the victim and shooting downward would have caused a wound like the one that killed Campos. *See United States v. Westmoreland*, 240 F.3d 618, 630 n.4 (7th Cir. 2001) (finding informant's statements reliable when they "were generally consistent, both internally and with the remainder of the evidence"). Daniels and Wilhelm also identified Anaya as participating in the attack, and the district court found credible their testimony that "an individual emerged from Anaya's van with a gun and began shooting at them." Sent. Tr. 41. In light of the witnesses' description of the Latin Kings' unprovoked attack on the three Latin Counts and the testimony concerning the gang's other acts of violence against their rivals, the district court had ample basis to reject the self-serving statements of Anaya and his co-conspirators that they were unarmed when they rode into the Latin Counts' territory. Indeed, even the Latin King leaders to whom Ortiz and Clay made that claim did not believe it; as Vargas explained, entering rival territory without weapons "jeopardiz[ed] their lives" and would result in "get[ting] whooped" or "dealt with real bad." Tr. 841.

Even if the evidence did not establish that the Latin Kings killed Campos and she was instead shot accidentally by a member of the Latin Counts, Anaya is

responsible for the murder under a felony murder theory. Anaya does not challenge the district court's ruling to that effect on appeal, and any claim that the district court's finding was erroneous is therefore waived. *See*, *e.g.*, *United States v. Useni*, 516 F.3d 634, 658 (7th Cir. 2008) (a party waives an argument if he fails to raise it in his opening brief); *United States v. McCauley*, 659 F.3d 645, 652 & n.4 (7th Cir. 2011).

Any such challenge would also be meritless. Under Illinois state law, a defendant is guilty of first degree felony murder when he causes a person's death while "attempting or committing a forcible felony other than second degree murder," 720 Ill. Comp. Stat. 5/9-1(a)(3) (West 2002), and, for purposes of that statute, "mob action" constitutes a "forcible felony." *See People v. Banks*, 678 N.E.2d 348 (Ill. App. Ct. 1997); *see also* 720 Ill. Comp. Stat. 5/25-1(a)(1) (West 2008) (defining the felony of mob action at the time of the offense as "the use of force or violence disturbing the public peace by 2 or more persons acting together and without authority of law"). Anaya and his confederates admitted that they threw glass bottles at the three Latin Counts, *see* Tr. 214, 397-98, and the forensic evidence bore that out, Tr. 535, 537-39. The district court therefore did not clearly err by concluding that Anaya and the others engaged in mob action against their rivals by "throwing beer bottles and fighting with the Latin Counts." Sent. Tr. 43;

17

*cf. In re Dionte J.*, 993 N.E.2d 909, 924 (Ill. App. Ct. 2013) ("The predicate felony [of mob action] was complete when defendant bent down to pick up a wooden board and started swinging it, and his swing was not toward the murder victim."). The district court's additional finding that Anaya could foresee that someone would get shot in the course of the Latin Kings' violent confrontation with an equally violent rival, Sent. Tr. 43, is also not clearly erroneous. The evidence established that the Latin Kings would shoot at rivals merely for entering Latin Kings territory, Tr. 47, 136, and the court could reasonably conclude that the Latin Counts would do the same. *See, e.g.*, Tr. 841 (Latin Kings were "jeopardizing their lives" if they entered rival gang neighborhoods unarmed); Tr. 946 (Latin Kings were Latin Counts' main rival and Bush chapter was "always getting . . . into it with the Counts").

> D.    The District Court Did Not Err In Concluding By A Preponderance Of The Evidence That Anaya Was Responsible For More Than 150 Kilograms Of Cocaine.

Anaya next challenges the court's use of a preponderance-of-the-evidence standard in calculating the quantity of drugs involved in his drug offense. This Court has "disavowed this argument . . . as it is well-established that a preponderance of the evidence is all that is required for a factual finding of drug quantity under the Sentencing Guidelines, due process concerns notwithstanding."

18

*United States v. Medina*, 728 F.3d 701, 705 (7th Cir. 2013). The Supreme Court's recent decision in *United States v. Alleyne*, 133 S. Ct. 2151 (2013), does not counsel otherwise. The Court in *Alleyne* held that "facts that increase mandatory minimum sentences" must be found beyond a reasonable doubt by the jury. *Id.* at 2163; *see id.* at 2155. Since *Booker*, however, the sentencing guidelines have been "advisory," not mandatory, 543 U.S. at 246, and nothing in *Alleyne* would preclude a judge from finding facts that increase that range by a preponderance of the evidence, whether or not the jury found those same facts under a reasonable-doubt standard. Indeed, the Court in *Alleyne* made clear that its holding did not imply a Sixth Amendment problem with judicial factfinding "used to guide judicial discretion in selecting a punishment 'within limits fixed by law.'" 133 S. Ct. at 2161 n.2 (quoting *Williams* v. *New York*, 337 U.S. 241, 246 (1949)); *see id.* at 2162-64 & n.6. Judicial factfinding that affects only the advisory guidelines range, rather than the statutory sentencing range, falls within the category of judicial sentencing-related factual determinations specifically preserved in *Alleyne*.

The district court also did not clearly err in concluding that Anaya was responsible for 150 kilograms or more of cocaine. Although Anaya may not have personally distributed large quantities of illegal drugs, "[f]or sentencing purposes,

19

a criminal defendant convicted of a drug trafficking conspiracy is liable for the reasonably foreseeable quantity of drugs sold by his or her co-conspirators." *United States v. Seymour*, 519 F.3d 700, 710–11 (7th Cir. 2008). Moreover, the government is not required to show that the defendant had "direct knowledge of any particular transaction"; instead, "[r]easonable foreseeability refers to the scope of the agreement that [a defendant] entered into when he joined the conspiracy, not merely to the drugs he may have known about." *Id.* at 711 (internal quotation marks and citations omitted). In this case, it was "no secret" that the Latin Kings "mov[ed] huge quantities" of cocaine and marijuana, Tr. 251: "everyone knew" that Alexander Vargas and others sold over 150 kilograms of cocaine and "massive amounts" of marijuana during the course of the conspiracy, Tr. 251; the gang's drug dealing was routinely discussed at their meetings, Tr. 260, 310; and members' mandatory dues went towards the purchase of drugs for their chapter, Tr. 262. Anaya's positions in the Latin Kings also made him privy to the scope of the gang's drug trafficking activities. At various times, he had been an Inca for the Bush chapter, Tr. 118, the chapter's Enforcer (muscle), Tr. 840, the chairman of the council that decided the punishments for violating the gang's laws, Tr. 837-38, and "one of the main security guys" for Vargas, who was one of the Latin King's top drug dealers, Tr. 251, 808, 828-29, 842. Thus, the record supported the district

20

court's conclusion that "[a]s a leader and a long-term member of the Latin Kings, Anaya would have been aware of the large scale narcotics distribution ring that his fellow gang members participated in," and that Anaya, "along with all Latin Kings, would have benefitted from the profits from those drugs sales." Sent. Tr. 44.

Even if the district court's drug-quantity finding was clearly erroneous, it did not affect the calculation of the guidelines. The offense level for Anaya's RICO conspiracy conviction (43) exceeded the adjusted offense level for his narcotics conspiracy conviction (40) and thus controlled his combined offense level. *See* U.S.S.G. § 3D1.4. Moreover, Anaya faced the same guidelines range on the narcotics conspiracy count as a result of his career offender status (360 months to life). Any error was therefore harmless.

E.     Anaya's Sentence Was Substantively Reasonable.

Finally, Anaya contends that his below guidelines sentence of 30 years of imprisonment was substantively unreasonable because the district court failed to consider the need to avoid unwarranted sentencing disparities. The facts and relevant law show otherwise.

Section 3553(a) sets forth the factors a court must consider when imposing sentence, including "the need to avoid unwarranted sentence disparities among

21

defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Because the Sentencing Commission has paid significant attention to unwarranted disparities among similar defendants, "a district court judge necessarily considers unwarranted disparities when it decides to impose a within-Guidelines sentence." *United States v. Pape*, 601 F.3d 743, 750 (7th Cir. 2010); *see also*, *e.g.*, *United States v. Nania*, 724 F.3d 824, 840 (7th Cir. 2013). That also means that a below-range sentence, such as Anaya's, will rarely create an unwarranted disparity adverse to the defendant. *Nania*, 724 F.3d at 840-41.

Even if Anaya's claim were not foreclosed by the principle that a below-Guidelines sentence cannot be the basis for a Section 3553(a)(6) disparity challenge, he has not shown that his sentence was unreasonable. The district court considered Anaya's disparity argument and imposed the below-guidelines sentence, in part, to "be consistent with all of the other defendant[s'] [sentences]." Sent. Tr. 73. As it explained, however, the co-conspirators Anaya mentioned either cooperated or pleaded guilty, and the court appropriately considered those differences. *See ibid.* ("I have also considered what has happened to the other individuals. . . . There are reasons of cooperation which was not in this case. There are reasons of some defendants having pled guilty, not putting the government through the burden of proving the guilt beyond a reasonable doubt.

22

I've taken all these things into consideration."); *see also United States v. Turner*, 604 F.3d 381, 389 (7th Cir. 2010) ("A difference justified by the fact that a codefendant assisted the government, whereas the defendant did not is not 'unwarranted.'"). In addition, Anaya's role in the Latin Kings distinguished him from the other participants in the Campos shooting. *See* Sent. Tr. 69 (prosecutor stated that Anaya had "ten to 12 years membership in the Latin Kings beyond [Ortiz and Clay] and they followed his leadership"); *see also United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013) ("As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances."). Finally, Anaya cannot show that his 30-year sentence was unreasonable in light of the court's consideration of the remaining Section 3553(a) factors, including the seriousness of his crimes and his criminal history.

## II. Reyes's Appeal Should Be Dismissed Because He Knowingly And Voluntarily Pleaded Guilty And Waived His Right to Appeal.

Reyes contends that the plea agreement and plea colloquy were insufficient and that he did not "fully understand" (Reyes Br. 5) that, by pleading guilty, he was waiving his right to appeal. The record belies those claims.

### A. Background

Reyes entered into a plea agreement in which he agreed to plead guilty to count one of the third superseding indictment, described above. G.A. 47-51. Reyes

23

acknowledged in the agreement that he was pleading guilty because he was "in fact, guilty of the offense charged in Count One" and that he was "prepared to state to the court the facts in this matter" that caused him to believe that he was guilty. G.A. 49, 50. He also understood that he faced a maximum term of life imprisonment and that the district court would determine the sentence based on the PSR, the sentencing guidelines, and the parties' submissions. G.A. 48-49. Reyes further understood that the government agreed to recommend a sentence "at the low end of the United States Sentencing Guidelines range, as that range is determined by the Court," but that the recommendation (and others in the plea agreement) were not binding on the court and he could not withdraw his guilty plea if the court did not follow the recommendations. G.A. 49-50.

The plea agreement contained the following appeal-waiver provision.

> I understand that the law gives a convicted person the right to appeal the conviction and the sentence imposed; I also understand that no one can predict the precise sentence that will be imposed, and that the Court has jurisdiction and authority to impose any sentence within the statutory maximum set for my offense as set forth in this plea agreement; with this understanding and in consideration of the government's entry into this plea agreement, I expressly waive my right to appeal or to contest my conviction and my sentence or the manner in which my conviction or my sentence was determined or imposed, to any Court on any ground, including any claim of ineffective assistance of counsel unless the claimed ineffective assistance of counsel relates directly to this waiver or its negotiation."

G.A. 50. Reyes acknowledged that he was offering to plead guilty "freely and

24

voluntarily" and that no promises, other than those in the agreement, had been made. G.A. 51.

At the change–of-plea hearing, Reyes affirmed, under oath, that he understood the plea agreement and had discussed it with his attorney. Plea Tr. 4, 9. He again acknowledged that the district court would have the "final say" at sentencing, Plea Tr. 15-16, and that he would not be able to withdraw his plea if the court did not follow the recommendations in the plea agreement or if the sentence was "more severe than [he] expected,"Plea Tr. 28-29. He also stated that he understood the appeal waiver provision and was "knowingly and voluntarily" "giving up all of [his] rights to appeal any sentence or any finding of guilty." Plea Tr. 26-27; *see also* Plea Tr. at 27 (Reyes stated that he understood that "down the road [he's] not going to be able to call up [defense counsel] and say, I don't like what that judge sentenced me to, I want to appeal, or, that judge went crazy and gave me a sentence that was too high, I want to appeal"). Reyes then provided the factual basis for his plea: he admitted that he had been a member of the Latin Kings since he was 18; that, as a "Regional Inca" for South Texas, he ensured that the boss did not overstep boundaries and mistreat others; and that he distributed, and helped others distribute, cocaine and marijuana. Plea Tr. 31-38; *see also* Plea Tr. 40 (Reyes stated that he agreed with the government's summary of his criminal

25

conduct). The district court accepted Reyes's guilty plea, finding that it was "a knowing and voluntary plea supported by an independent basis in fact containing each of the essential elements of the offense." Plea Tr. 42.

At the sentencing hearing, the district court accepted the plea agreement, and, without objection, concluded that the advisory guidelines range was 262 to 327 months of imprisonment. Sent. Tr. 5-6. Consistent with the terms of the plea agreement, the government recommended a sentence of 262 months, although it noted that "in quick plea negotiations, we indicated that a 17-year sentence might have been appropriate." Sent. Tr. 20. The court agreed with the government's recommendation and sentenced Reyes to 262 months of imprisonment. Sent. Tr. 26-27. After imposing sentence, the court noted that "[n]ormally" it would explain a defendant's right to appeal but that Reyes had agreed to waive "all of [his] rights to an appeal with very few exceptions." Sent. Tr. 31. Reyes stated he "recall[ed]" that he had agreed to waive appeal. *Ibid.*

Reyes never moved to withdraw his guilty plea. He filed a pro se notice of appeal and, to that end, submitted a request to the district court for the docket sheet and transcripts. R. 1101.

B.     Standard of Review

Because Reyes did not move to withdraw his guilty plea in the district court, this Court reviews his challenge to the appeal waiver and the guilty plea proceeding for plain error. *United States v. Kilcrease*, 665 F.3d 924, 927 (7th Cir. 2012); *United States v. Patterson*, 576 F.3d 431, 438 (7th Cir. 2009). Under plain error review, a defendant must establish "(1) an error (2) that was plain, (3) affected the defendant's substantial rights, and (4) seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Ibid.*

C.     The District Court Complied With Rule 11 Of The Federal Rules Of Criminal Procedure And Did Not Err By Accepting Reyes's Guilty Plea.

"A guilty plea must be entered knowingly and voluntarily in order to be valid." *United States v. Walker*, 721 F.3d 828, 842 (7th Cir. 2013), *pet. for cert. filed*, No. 13-7557 (Nov. 21, 2013). To ensure this, Federal Rule of Criminal Procedure 11 requires that the trial judge address the defendant in open court, inform the defendant of enumerated constitutional rights, and satisfy itself that the defendant understands the consequences of pleading guilty. The record of the guilty plea colloquy "is entitled to a presumption of verity." *United States v. Adams*, --- F.3d ---, 2014 WL 718366, *9 (7th Cir. Feb. 28, 2014) (quotation marks and citation omitted).

The district court conducted the plea colloquy by the book. It reviewed the charges and the plea agreement in detail; it advised Reyes as to each of the rights he would be giving up by pleading guilty; it discussed the sentencing implications of Reyes's guilty plea, including the operation of the sentencing guidelines and the fact that the court had the "final say" (Plea Tr. 16) in determining Reyes's sentence; it addressed at length the appeal waiver provision of the plea agreement; and it determined that there was a factual basis for the plea. *See* Fed. R. Crim. P. 11(b). Reyes stated that he understood each of the court's explanations and never asked for additional clarification despite the court's assurance that it would "rephrase the question" if Reyes did not understand what the court was asking. Plea Tr. 5. Reyes also stated that no one had forced him to plead guilty or made any promise or prediction as to his sentence. Plea Tr. 23, 29.

Despite the court's meticulous questioning during the plea colloquy, Reyes argues that the plea colloquy was inadequate because the court solicited "predominantly 'yes' or 'no' type answers" and did not engage Reyes in "a dialogue." Reyes Br. 5. As this Court has recognized, "the fact that [the defendant's] responses were largely 'yes' or 'no,' without more [does not] defeat th[e] presumption" that Reyes truthfully responded to the court's inquiries. *United States v. Alcala*, 678 F.3d 574, 579 (7th Cir. 2012); *see also United States v. Messino*,

28

55 F.3d 1241, 1253-54 (7th Cir. 1995) (rejecting defendant's claim that plea colloquy was inadequate because court asked only yes-or-no questions). Reyes has not demonstrated that additional questioning was necessary to ensure that his plea was knowing and voluntary. Reyes is a native English speaker with a master's degree in counseling, Plea Tr. 7, and he consistently affirmed that he understood the court's inquiries, which often included follow-up questions and examples. *E.g.*, Plea Tr. 19-22, 26-27. Moreover, as Reyes concedes, the questioning as to the factual basis for the plea and the reason that Reyes was pleading guilty elicited narrative responses. Plea Tr. 31-37.

Reyes relies on *United States v. Frye*, 738 F.2d 196 (7th Cir. 1984), but that case is nothing like this one. The court there concluded that the district court erred in denying the defendant's motion under 28 U.S.C. § 2255 without an evidentiary hearing because she had a plausible claim that she did not knowingly plead guilty. The court found "particularly significant" the fact that she may not have received conflict-free representation (her attorney also represented her co-defendant husband), the defendant never admitted that she had the intent required for the offense of conviction, and the district court's exchange consisted of a "summary paraphrasing of the charges," a "series of routine questions," and "no explanation of the intent requirement." *Id.* at 200-201. Under those particular circumstances,

the Court concluded that the colloquy was inadequate and that an evidentiary hearing was necessary to determine whether the Rule 11 violation warranted reversal. *Id.* at 201.

Reyes also argues that the plea agreement was "[c]onstitutionally insufficient" because it did not allege the facts of the offense or recite the applicable guidelines range. Reyes Br. 4. He provides no legal support for the novel proposition that a defendant has a constitutional right to the inclusion of specific provisions in a plea agreement. Moreover, the alleged omissions have no bearing on the validity of the plea. Reyes does not contend that he did not understand the nature of the offense to which he was pleading guilty, and his admissions during the plea colloquy demonstrate that he understood the charge and was, in fact, guilty. Nor must a defendant have advance notice of the calculation of the advisory guidelines before entering a plea. *United States v. Barnes*, 83 F.3d 934, 938-39 (7th Cir. 1996) ("[W]hen the government and a defendant agree on a guilty plea regulated by Rule 11(e)(1)(B), the punishment is not an essential term of the plea agreement. . . . Thus, the defendants in many criminal cases can enter into valid plea agreements, and district courts can enforce them, without the parties' knowing in advance exactly what sentence the court will impose."). Both the plea agreement and the plea colloquy informed Reyes of the

30

essential information – that he faced a sentence of up to life imprisonment, that the parties' recommendations were not binding on the court, and that the district court would determine the advisory guidelines range and sentence after the PSR was prepared and the parties filed their sentencing memoranda. There was also no reason for the court to ask Reyes "to articulate the sentence he could have incurred," Reyes Br. 6, when Reyes stated under oath that he understood the penalties he was facing and declined to have the court repeat them at a later point in the proceeding. Plea Tr. 24-25.

The record also does not support Reyes's claim that he pleaded guilty because he understood that the government would recommend a 17-year sentence. The plea agreement explicitly stated that the government would recommend a sentence at the low end of the advisory guidelines range "as that range is determined by the Court" and further provided that the government would oppose "any sentence below the guidelines." G.A. 50. And even if Reyes was under the mistaken impression before the change-of-plea hearing that the government thought a 17-year sentence "might have been appropriate," *see* Sent. Tr. 20, Reyes admitted during the plea colloquy that he understood the government's sentencing position and further stated that no one "made any other or different promise or assurance . . . of any kind in any effort to induce or cause [him] to enter a plea of

31

guilty." Plea Tr. 20-22. Thus, any "confusion" on his part (Reyes Br. 5) as to the government's sentencing obligation was dispelled by the court during the plea hearing. *Cf. Barker v. United States*, 7 F.3d 629, 633 (7th Cir. 1993) (any confusion resulting from erroneous advice from defense counsel was cured by court's taking "careful and appropriate measures to dispel any confusion on [defendant's] part before the plea was accepted").

Even if the district court erred by not engaging in further dialogue with Reyes – and we do not believe that it did – Reyes has not met the stringent plain-error standard. He has not offered any reason to believe that his narrative responses would have contradicted his sworn statements to the district court, let alone caused Reyes to reconsider his decision to plead guilty. *See United States v. Dominguez Benitez*, 542 U.S. 74, 76 (2004) (defendant who seeks to withdraw guilty plea on the ground that the district court committed plain error under Rule 11 "must show a reasonable probability that, but for the error, he would not have entered the plea").

### D. This Court Should Dismiss Reyes's Appeal Because He Voluntarily Waived His Right To Appeal.

This Court will enforce an appeal waiver so long as the waiver was knowing and voluntary. *Alcala*, 678 F.3d at 578; *Kilcrease*, 665 F.3d at 927. In making that determination, the Court lends "particular credence" to a defendant's

representations under oath during the plea colloquy. *Alcala*, 678 F.3d at 578. "The court may also consider the fact that the defendant was represented by counsel, which barring an ineffective assistance claim (which is not alleged here), supports a conclusion that the defendant's waiver was informed and strategic." *Id.* at 579. And a finding that a defendant knowingly and voluntarily pleaded guilty also "means that his waiver is enforceable." *United States v. Zitt*, 714 F.3d 511, 515 (7th Cir. 2013).

The language of the appeal waiver was express and unambiguous, and the record establishes that Reyes knowingly and voluntarily waived his right to appeal.[3/] The district court explained in detail the meaning of the appeal waiver, and Reyes informed the court that he had discussed the waiver with his attorney, had no further questions of the court, and was "sure" that he wanted to waive appeal. Plea Tr. 26-28.

Reyes argues that his pro se filing of a notice of appeal and request for transcripts indicate that he did not "fully understand" his appeal waiver. Reyes Br. 5. In light of the court's careful explanations and Reyes's assurances that he understood the waiver provision, the argument is unsupported. A more logical

---

[3/] Reyes does not contend that his appeal does not fall within the scope of the waiver or that the terms of the waiver were ambiguous.

inference from Reyes's post-sentencing conduct is that he was unhappy with the sentence and, in hindsight, believed that the plea bargain was "a bad one." *Alcala*, 678 F.3d at 580 (quotation marks and citation omitted). Reyes's representation to the district court at sentencing that he knew that he had waived appeal and his failure to move to withdraw his guilty plea further support the conclusion that his belated challenge to the plea agreement and guilty plea colloquy reflect not a lack of understanding but instead a buyer's remorse.

## CONCLUSION

The judgment of the district court against Anaya should be affirmed. Reyes's appeal should be dismissed. In the alternative, the judgment of the district court against Reyes should be affirmed.

Respectfully submitted,

DAVID CAPP
  United States Attorney
  Northern District of Indiana

DAVID J. NOZICK
  Assistant U.S. Attorney
  Northern District of Indiana

JOSEPH A. COOLEY
  Trial Attorney
  Organized Crime & Gang Section
  Criminal Division

DAVID A. O'NEIL
  Acting Assistant Attorney General
  Criminal Division

DAVID M. BITKOWER
  Deputy Assistant Attorney General

/s/ Kirby A. Heller
KIRBY A. HELLER
  Attorney
  Appellate Section, Criminal Division
  U.S. Department of Justice
  950 Pennsylvania Ave., NW Room 1256
  Washington, DC 20530
  (202) 307-0085
  kirby.heller@usdoj.gov

April 10, 2014

35

# CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32(a)(7)

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, I hereby certify that this brief complies with the type-limitation of Fed. R. App. P. 32(a)(7)(B) in that the brief is proportionally spaced, has a typeface of 14 points, and contains 7855 words. This certification is based on the word count of the word-processing system used in preparing the government's brief: Word Perfect X4.

/s/ Kirby A. Heller
KIRBY A. HELLER
Attorney for the United States

**CERTIFICATE OF SERVICE**

I hereby certify that, on April 10, 2014, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. The following counsel of record, who are registered CM/ECF users, were thereby served:

Adam Tavitas
Counsel for Appellant Anaya

Amir Mohabbat
Counsel for Appellant Reyes

/s/ Kirby A. Heller
KIRBY A. HELLER
Attorney for the United States

37